JERRY W. TYLER *v.* STATE OF INDIANA.

[No. 3-972A59. Filed May 16, 1973. Rehearing denied July 3, 1973. Transfer denied February 4, 1974.]

*Larry Busick, Osterman & Busick,* of Fort Wayne, for appellant.

*Theodore L. Sendak,* Attorney General, *Anthony J. Metz,* Deputy Attorney General, for appellee.

SHARP, J.—On February 13, 1971 Chalmer Frank Boxell and his wife pulled into a parking lot across the street from the Boxell residence at 613 Osage Street, Fort Wayne, Indiana.

As they were getting out of their car, the Appellant pulled up behind them and got out of his car with a rifle. He asked Mr. Boxell if the car which the Boxell's had just gotten out of belonged to Mr. Boxell who answered in the affirmative. Then the Appellant said, "Well, I've been hired to assassinate you." Mr. Boxell tried to tell the Appellant that there was a mistake but the Appellant replied, "No, I was sent down from Chicago and was paid to . . ." The Appellant and the Boxells then went into the latter's residence. While inside, the Appellant struck Mr. Boxell in the chest with the rifle and then placed it next to Mr. Boxell's throat. The Appellant told Mrs. Boxell, "Put the dog down, you know I'm going to have to shoot you too." When Mrs. Boxell put the dog down, Mr. Boxell grabbed the barrel of the rifle, but the Appellant struck him and rendered him unconscious.

As a result of the beating, Mr. Boxell received rather severe head injuries, fractured facial bones and a lot of stitches requiring hospitalization and resulting in scars and a crooked nose.

Fort Wayne police officers were summoned to the scene of the Boxell residence on a report of an armed man. Upon their arrival, they saw the Appellant flee with a rifle in his hand. The police officers pursued the Appellant and finally apprehended him in an alley and placed him under arrest. At that time the Appellant no longer had the rifle in his possession but his footprints left in the snow led the officers to some bushes where the rifle was found and an examination of it disclosed bits of flesh and blood in the chamber. The Appellant was charged with aggravated assault and fleeing from a police officer under IC 1971, 35-13-3-1, Ind. Ann. Stat. § 10-410 (Burns 1972 Supp.) and IC 1971, 35-21-2-1, Ind. Ann. Stat. § 10-1817 (Burns 1972 Supp.) respectively.

Between February 13, 1971 and January 7, 1972 negotiations took place between the Appellant, Mr. Boxell, and the Prosecuting Attorney. In these negotiations both the Appellant and Mr. Boxell were represented by counsel. These

negotiations resulted in an agreement between the parties, which agreement was not reported to the trial court on or any time before January 7, 1972. In essence the agreement provided that the Appellant would plead guilty to both charges, the same being aggravated assault and battery and fleeing a police officer. The Appellant agreed to pay Mr. Boxell the sum of $5,000.00 as and for a settlement of a civil claim for damages resulting from assault and battery, for which Mr. Boxell would provide the Appellant a complete release. In addition, Mr. Boxell agreed to recommend that any jail time the Appellant received from the court be suspended. The Prosecuting Attorney agreed to make a recommendation on the fleeing charge of a fine of $500.00 and six month sentence in jail, the six month jail sentence to be suspended. The Prosecuting Attorney further agreed to stand mute with regard to the aggravated assault and battery charge. This agreement was carried out and performed by each of the parties to it without deviation.

This case had originally been set down for trial to commence on January 7, 1972. On that day the Appellant withdrew his plea of not guilty to both of the charges and entered a plea of guilty. At that time the following relevant proceedings occurred between the trial court and the Appellant:

"Q. Before reading the charge to you and before asking you if you plead guilty or not guilty, you are instructed that the charge against you is a felony and that the penalty, as fixed by the legislature, is: . . . imprisonment for a period of 1 to 5 years and/or a fine of not less than ———— nor more than $1,000.00. . . . Do you understand this?

A. Yes.

\* \* \*

Q. Is the plea you are about to enter being made of your own free will?

A. Yes.

Q. Is it being made with full understanding of the consequences?

A. Yes.

Q. Is it being made voluntarily?

A. Yes, it is.

Q. Has anyone made any promises to you or threatened you in any way to induce you to plead either guilty or not guilty?

A. No.

\* \* \*

Q. Has your lawyer discussed with you and explained to you the questions which I have asked you from these mimeographed sheets concerning your arraignment?

A. Yes, he has.

\* \* \*

Q. Did you do the acts alleged to have been done by you?

A. Yes, sir.

\* \* \*

Q. How do you plead—Guilty or not Guilty?

A. Guilty."

The Prosecuting Attorney in open court on January 7, 1972 did precisely as he had agreed to do. On January 7, 1972 the trial judge set February 7, 1972 as the date for sentencing. On February 7, 1972 Mr. Boxell asked the court to suspend any jail time the trial court might see fit to impose upon the Appellant but the court rejected that request and sentenced the Appellant for a term of one to five years. We have examined the complete transcript of the proceedings on February 7, 1972 and can find nothing in them in which the extent and nature of these negotiations were brought to the court's attention prior to the entry of the sentence. On February 7, 1972 the Appellant was sentenced for a period of not less than one year, nor more than five years and a fine of One Hundred Dollars ($100.00) on the charge of aggravated assault. On the charge of fleeing a police officer Appellant was sentenced to six months on the Indiana State Farm and fined Fifty Dollars ($50.00). Both sentences were to run concurrently. However, just after the sentence was imposed the following occurred:

"MR. BUSICK: Your Honor, it might be a little bit out of line at this point, but obviously we had negotiated between ourselves here, subject to the Court's approval, because—

well, now because of those negotiations going awry at this stage, I would ask the Court to consider giving the defendant two days to get his financial affairs as well as his family affairs in order prior to commencement of the sentence.

THE COURT: He has until 2/14/72.

MR. BUSICK. Thank you, Your Honor."

The transcript and record of this case discloses that the Appellant and his counsel studiously avoided giving the trial judge in this case any knowledge or notice of the aforesaid negotiations before the entry of sentence. This fact was admitted by Appellant's counsel in oral argument.

On June 14, 1972 the Appellant filed Motion to Correct Errors and then, for the first time, laid before the trial court the full nature and extent of the aforesaid negotiations and agreement. At no time in this case did the Appellant, through his counsel, make any formal request to the trial court to withdraw his pleas of guilty. The only assertions of a formal nature which were before the trial court were those in Appellant's Motion to Correct Errors. The colloquy between the trial court and Appellant's counsel on June 14, 1972 at that time when Appellant's Motion to Correct Errors was under consideration by the trial court is revealing:

"THE COURT: Mr. Busick, are you saying that this Court had knowledge of any arrangement prior to his entering this plea?

MR. BUSICK: Not at the time the plea was entered, Your Honor, no. I'm not saying that. I don't believe that's the case.

THE COURT: As a matter of fact, I didn't know anything about it until you stood here at this bench for sentencing.

MR. BUSICK: I believe that's true.

THE COURT: That's the first time I ever heard anything about any deal.

MR. BUSICK: As far as I know, that would be correct."

The negotiations above described, in essence, amounted to an attempt at a civil settlement of a criminal offense. It is

elementary that the criminal process is designed for the protection of society as a whole and not to afford restitution to a single victim of a criminal action. The trial judge could not in good conscience allow Appellant to go free merely because he paid his victim the sum of $5,000.00. The trial judge was not privy to these negotiations and the record and assertions made in oral argument strongly suggest that they were deliberately withheld up to the time of sentencing. The quoted testimony at the time of the entry of the guilty plea on January 7, 1972 from the mouth of the Appellant under oath states categorically that no promises were made to him. The Appellant and his counsel engaged in a calculated strategy to withhold this information from the trial court before sentencing. In oral argument Appellant's counsel on several occasions admitted that Appellant's testimony on January 7, 1972 that no promises had been made was categorically untrue.

The Appellant now asks for relief on the strength of the case of *Dube* v. *State* (1971), 257 Ind. 398, 275 N.E.2d 7. This writer believes generally that the factual context in which rules of law are announced are often an absolutely essential ingredient to a proper understanding and application of those announced rules. The facts in *Dube* v. *State* indicate it would have been a flagrant miscarriage of justice to deny the defendant in that case to withdraw his plea. In *Dube* the arrangement had been made with the authorities for the highly bona fide public purpose of securing evidence of criminal conduct in a forgery gang. In exchange for this information the Prosecuting Attorney was to recommend a suspended sentence for Dube. Dube made it quite clear that if he cooperated with the police his life would be in danger if he were imprisoned. He was assured that the trial court in that case would follow the Prosecutor's recommendation. At Dube's arraignment he entered a plea of guilty to forgery and the Prosecutor did not make his recommendation for suspended sentence at that time but did make it at the sen-

tencing. The court, however, rejected the Prosecutor's recommendation and sentenced Dube for a term of two to fourteen years. Immediately thereafter a rehearing was requested and both the defense counsel and the Prosecuting Attorney attempted to prevail upon the trial judge to honor their agreement. The trial judge, however, refused and our Supreme Court of this State reversed. One statement by our Supreme Court in *Dube* is revealing:

> "Clearly, the mere expectation of receipt of a lesser sentence would not be sufficient to make a plea involuntary. . . . However, more than a mere expectation existed in this instance. Dube, who has only a fourth grade education, was told by his attorney that, althought the decision was up to the Judge, he had always gone along with the prosecutor's recommendation. Add to this the assurance given Dube by police officers that the prosecutor would make the recommendation as long as Dube cooperated, and the voluntariness of the guilty plea becomes highly suspect."

The contrast between *Dube* and *Tyler* is real and significant. Dube committed a crime not involving violence. Tyler committed a crime involving severe violence. One cannot question that violence when he observes the bloody and battered countenance of Mr. Boxell in a picture contained in the transcript. Tyler performed no public service in exchange for the recommendations of leniency but instead offered cash to his victim in exchange for the victim's recommendation. Dube cooperated fully with the authorities in shattering the forgery ring in which he was once a member in exchange for a recommendation by the prosecuting attorney for leniency. There is no evidence that Tyler would suffer bodily harm if he were incarcerated. Dube's life was threatened many times while he was incarcerated. The prosecuting attorney in *Dube* offered to recommend a suspended sentence for the one offense against Dube thus keeping Dube out of jail altogether. In this case the Prosecutor offered to recommend a sentence with regard to the charge of fleeing a police officer but he did not offer to make such a recommendation with regard to the charge of aggravated assault and battery, thus even under

the agreement Tyler could have received jail time. In this connection it is important to emphasize that the recommendation for leniency with regard to the offense of aggravated assault and battery was given by Tyler's victim, as arranged, and not by the Prosecuting Attorney. In this case Tyler asks this court to give full force and effect to plea bargaining arrangements made between the prosecutor, defense and the State's material witness. Dube asked only to withdraw his plea and to stand trial for the crime with which he was charged.

This case essentially comes down to a question of time. Under the authority of the *Dube* case can a defendant, such as the Appellant here, deliberately withhold from the sentencing trial court any knowledge or notice of such a private agreement and then, after sentencing, be heard to complaint that such action renders the plea involuntary. We refuse to believe that our Supreme Court intended for *Dube* to be extended that far. If we put our judicial seal of approval on the arrangement here we are opening the door very wide to permit a defendant in a criminal proceeding to have it both ways, to win even while losing. We don't believe *Dube* addresses itself to the situation as here, where the defendant deliberately as a matter of calculated strategy withholds the knowledge of plea bargaining from the sentencing trial court until after the sentence is imposed. We cannot agree to this unwarranted extension of the *Dube* case.

After testifying in the trial court, under oath, on January 7, 1972 that no promises had been made in regard to a guilty plea the Appellant now attempts to rely on private promises made to him by his own counsel that the trial court would follow the recommendations of the victim and the prosecutor. Whether it was wise for Appellant's counsel to make such a promise to his client is a question we need not reach here. It seems clear enough that the trial court had a right to rely on the explicit statements, *under oath,* that no such promises were

made. After having heard such explicit statements, the trial court was not chargeable with the knowledge of the private confidential communication between Appellant and his counsel. Such circumstances should not and, in our opinion cannot, be the basis of attacking the voluntariness of a plea. To impose such a burden on a trial court in the context of this case is to place on it an unconscionable dilemma. To permit the Appellant a new trial on this basis would give judicial sanction to perpetrating a fraud on the trial court. We do not read *Dube* as demanding such a result. Absent such a demand we decline to extend *Dube* to apply to these facts. The trial court adequately fulfilled his duty to make reasonable inquiry into the facts and circumstances surrounding the guilty plea. Therefore, the judgment of the trial court should be and hereby is affirmed.

Hoffman, C.J., concurs; Staton, J., dissents with opinion.

## DISSENTING OPINION

STATON, J.—There are four compelling reasons for my dissent from the majority opinion. These reasons involve the fundamental concept of plea bargaining, the trial court's abuse of discretion, artificial factual distinctions used to distinguish *Dube* v. *State* (1971), 257 Ind. 398, 275 N.E.2d 7 from the present case, and finally, the involuntary nature of Tyler's guilty plea. Each reason is discussed separately below and in the order set forth above.

REASON ONE: The majority opinion has introduced a new, novel and untried theory into the plea bargaining process. It suggests that the basis for plea negotiations is a ". . . highly bona fide public purpose . . ." and not the severity of punishment to be given the defendant under the charges made by the State.[1] If a ". . . highly bona fide public purpose . . ."

---

1. The Supreme Court of Missouri in *State* v. *Able* (1928), 320 Mo. 445, 8 S.W.2d 55, 56, stated:

"The offer by the defendant was not an extrajudicial confession; it was an attempted negotiation for a compromise, not of a felony, but of the punishment to be inflicted. The defendant was charged with a

is necessary before a defendant is allowed to plead guilty to a lesser includable offense or before he is permitted by the court to withdraw his plea,[2] or before the State can make a recommendation to the trial court as to the punishment of the Defendant, we can expect a sharp decline in the number of guilty pleas. Trial court dockets will become clogged with undisposed of cases and many cases will not be tried within the time provided by law. Trial courts and prosecutors will find that there is a complete lack of time as well as court facilities. Many defendants will have to be discharged. Our present judicial system cannot function if it is to be shackled with the theoretical concept of ". . . highly bona fide public purpose."[3]

---

capital offense; he stood in the shadow of the gallows. His offer was not inconsistent with a plea of not guilty. By his offer he, in effect, said he would plead guilty on condition that his punishment would be assessed at imprisonment in the penitentiary for five years rather than take the chance of the death penalty. This he had a right to do. . . ."

See also, *State* v. *Hamilton* (1970), 4 Or. App. 214, 476 P. 2d 207; *Dean* v. *State* (1913), 72 Tex. Cr. 274, 161 S.W. 974; *Pugh* v. *State* (1964), 42 Ala.App. 499, 169 So.2d 27; *Kercheval* v. *United States* (1927), 274 U.S. 220; and *Moulder* v. *State* (1972), 154 Ind. App. 248, 289 N.E.2d 522.

2. *DeFrisco* v. *State* (1972), 153 Ind. App. 609, 288 N.E.2d 576; *Lovera* v. *State* (1972), 152 Ind. App. 377, 283 N.E.2d 795 and *Darmody* v. *State* (1973), 156 Ind. App. 88, 294 N.E.2d 835. In none of the aforementioned cases, recently decided by this court, has a highly bona fide public purpose been necessary as a condition precedent to allowing the Defendant to withdraw his guilty plea.

3. Chief Justice Burger of the Supreme Court of the United States expressed the need and desirability of the plea bargaining process as it has evolved today in *Santobello* v. *New York* (1971), 404 U. S. 257, 92 S.Ct. 495, 498, 30 L.Ed.2d 427:

". . . The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities.

"Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and by shortening the time between charge and disposition, it enhances what-

REASON TWO: *The trial judge exhibited a clear abuse of discretion.* Before sentence was entered at the hearing, it was obvious that promises had been made to Tyler.[4] The trial judge did not make any investigation into the circumstances surrounding those promises.[5] Later when Tyler's

---

ever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned. See *Brady* v. *United States*, 397 U.S. 742, 751-752, 90 S.Ct. 1463, 1470-1471, 25 L.Ed.2d 747 (1970)."
See Cr. 4 of the Indiana Rules of Criminal Procedure and *Hart* v. *State* (1973), 260 Ind. 137, 292 N.E.2d 814.

4. The majority states in its opinion that "We have examined the complete transcript of the proceedings on February 7, 1972 and can find nothing in them in which the extent and nature of these negotiations were brought to the court's attention prior to the entry of the sentence." The full extent and nature of the plea bargaining negotiations were not brought to the trial court's attention, but there was very little left to be inferred from the testimony and exchange at the hearing before the sentencing. The only omission was the conversation set out in attorney's affidavit promising Tyler a suspended sentence if he changed his plea to guilty. There were numerous references to promises before sentence was entered. Justice Hunter in *Dube* v. *State* (1971), 257 Ind. 398, 275 N.E.2d 7, 10, has made it abundantly clear that the trial judge has a duty to make an investigation of the circumstances surrounding the entry of the plea when information comes to his attention that the plea may have been induced by promises. This was not done in the present case or even attempted by the trial judge. This is a gross abuse of discretion on the part of the trial judge. *Dube* v. *State, supra,* is clear as to the affirmative duty of the trial judge. Justice Hunter stated:

". . . A judge should have an affirmative duty to make such an investigation when information comes to his attention that indeed a plea may have been induced by promises. Equity and justice would demand it. In *Allman* v. *State* (1968), Ind., 235 N.E.2d 56, 62, this Court stated *that it is extremely important for the trial court to ensure that all rights of a defendant pleading guilty are zealously protected, and that when a withdrawal of a plea of guilty is requested 'the trial court's concern should not be directed solely to the question of the court's own legal justification in originally accepting the plea of guilty'. . . .*"

(our emphasis).
Justice Hunter went on to emphasize in *Dube* v. *State, supra,* 275 N.E.2d at 10 that:

". . . It is the trial court's duty to make a reasonable inquiry into the facts to discover whether a plea of guilty was entered freely and understandingly. *Gates* v. *State* (1962), 243 Ind. 325, 183 N.E.2d 601; *Dearing* v. *State* (1951), 229 Ind. 131, 95 N.E.2d 832."

5. See *Dube* v. *State, supra,* and the cases cited therein. Also see Article 4.1—ARRAIGNMENT AND PLEA AND PRETRIAL PLEADING of the new Criminal Procedure recently passed by the Legislature (April, 1973) and more particularly § 4 thereof reading as follows:

"Determining voluntariness and factual basis of plea. (a) The court shall not accept a plea of guilty without first personally addressing the defendant and determining that the plea is voluntary. The court shall address the defendant and determine whether any promises, force or threats were used to obtain the plea."

motion to correct errors explicitly set forth the circumstances surrounding the promises made to Tyler, the trial court refused to allow Tyler the opportunity to withdraw his plea of guilty. This amounted to a compounding of the abuse of discretion. First was the failure of the trial court to investigate and second, the failure of the trial court to recognize the involuntariness of the plea itself.

The informal sentencing hearing was very suggestive of promises. No one could avoid concluding that promises had been exchanged. Chalmer Frank Boxell had testified that he would recommend that Jerry Tyler receive a suspended sentence on the charge of aggravated assault. At the conclusion of his testimony, the record shows the following:

> "MR. BUSICK: I believe that would be all I would have.
> "THE COURT: Do you understand that if you made a deal with this fellow, that this fellow is worth about as much as yesterday's newspaper? You understand that, don't you?
> "A. That I don't know, sir.
> "THE COURT: You mean you're telling me that you're going to take this fellow's word for everything after his conduct? Is that what you're telling me?
> "A. No, I'm not, sir.
> "THE COURT: Now, Gentlemen, here's your record. 'Comes the defendant, in person and by counsel and is before the Court for sentencing herein. The Court now sentences the defendant to the Indiana Department of Corrections for a term of not less than one nor more than five years. The Court imposes a fine in the sum of $100.00 and costs.' Now, that's just what it's going to be. There will be no suspension of any sentence here. Any time a man walks into another fellow's house with a shotgun and threatens to shoot everybody in the house, whether it's loaded or isn't, is not going to come before me and want leniency. That just isn't going to happen.
> "MR. BUSICK: I understand that, Your Honor, but the—
> "THE COURT: I'm not suspending any sentence for your defendant period. Now, I don't trust him four

inches. He would repeat it again tomorrow, but he's not going to repeat it for one year, I'm sure of that. It's just that simple. Nor is the complaining witness going to bargain with him either.

"MR. DUEMLING: Judge, there is another case, 14570, which is fleeing a police officer. There has been a plea of guilty entered in that case, I believe. In view of the sentence on the other charge, the State would recommend that that be 6 months suspended and $500.00 and costs.

"MR. BUSICK: You're asking for the fine on top of it now?

"MR. DUEMLING: I'm only making the recommendation I told you I would make.

"MR. BUSICK: I mean in light of the sentence?

"MR. DUEMLING: Well, I think under the circumstances it's an academic matter since he would not be in a position to pay the fine anyway. So we can forget about a fine and let the 6 months run concurrently with the 1 to 5.

"THE COURT: All right. There will be a sentence of 6 months on the Farm, $50.00 and costs, to run concurrently with the sentence in 14547.

"MR. BUSICK: Your Honor, it might be a little bit out of line at this point, but obviously we had negotiated between ourselves here, subject to the Court's approval, because—well, now because of those negotiations going awry at this stage, I would ask the Court to consider giving the defendant two days to get his financial affairs as well as his family affairs in order prior to commencement of the sentence.

"THE COURT: He has until 2-14-72.

"MR. BUSICK: Thank you, Your Honor."

Jerry W. Tyler's motion to correct errors requested permission from the court to withdraw his plea of guilty and to re-enter his plea of not guilty. The motion to correct errors alleged that plea bargaining negotiations had taken place and that his plea of guilty had been entered as a result thereof. The motion to correct errors stated *inter alia:*

"4. That at said sentencing hearing, the State's material witness, Chalmer Frank Boxell did appear and under questioning by defendant's attorney did specifically request the Court to grant to defendant a suspended

sentence on the charge of aggravated assault and battery and did further advise the Court under questioning by defendant's attorney that said request was premised upon the agreement between defendant and Mr. Boxell that defendant would pay to Mr. Boxell FIVE THOUSAND DOLLARS ($5,000.00) in settlement of all claims existing between the defendant and Mr. Boxell and for the further consideration of having Mr. Boxell request such suspended sentence from the Court.

\* \* \*

"7. That prior to the entrance of the plea of guilty by defendant on the 7th day of January, 1972, to each of the above charges, defendant's attorney, Mr. Boxell's attorney, the Prosecutor and the two police officers for the City of Fort Wayne did negotiate concerning the disposition of the charge of aggravated assault and battery and the charge of fleeing a police officer after which negotiation defendant was advised by his attorney that if defendant would plead guilty of each of the charges the said Chalmer Frank Boxell would request of the Court a suspended sentence on the charge of aggravated assault and battery and the State of Indiana through the Prosecutor on the charge of fleeing a police officer would request the Court to impose a penalty of FIVE HUNDRED DOLLARS ($500.00) and costs plus six months in the Indiana State Prison, said six months in the Indiana State Prison to be suspended and defendant to be placed on probation for a minimum period of one (1) year.

\* \* \*

"10. That defendant at all times advised his attorney that he did not believe himself to be guilty of the charges brought and did not wish to plead guilty to such charges unless he be first assured that binding arrangements had been made between defense, prosecution and the State's witness to such extent that in the event defendant did plead guilty to the charges themselves, he would receive suspended sentences and thereby eliminate the risk of trial, the risk of outcome of trial and the added expense, burden and embarrassment of trial.

"11. That defendant made clear to defendant's attorney that unless binding satisfactory arrangements were previously made upon which defendant could safely base a plea of guilty defendant wished to avoid pleading guilty and instead demanded trial of the issues."

Jerry Tyler's attorney's affidavit supplemented the motion to correct errors. His attorney's affidavit stated that Jerry W. Tyler was advised to plead guilty and told that he need not entertain any fears of doing any time on either charge. Paragraph eleven (11) of the Affidavit is as follows:

"11. That based upon the negotiations arranged between Defense, Prosecution and the State's material witnesses concerning the disposition of the two charges in this cause of action upon the entrance by the defendant of a plea of guilty and the assurances of the Court upon previous requests that the Court would not upset deals or arrangements between defense and Prosecution, defendant's attorney did advise defendant that he should plead guilty to the charge as read that he would have nothing to fear and that the Court would accept the deals as arranged and would in fact give to the defendant suspension of all jail sentences as discussed between defense, Prosecution and the State's material witnesses."

*Dube* v. *State, supra,* relies upon *Long* v. *State* (1952), 231 Ind. 59, 106 N.E.2d 692. The Defendant's Writ of Coram Nobis in *Long* v. *State, supra,* relied upon the trial judge ignoring Rule 1-11 and his defense counsel having led him to believe that he would receive a suspended sentence if he entered a plea of guilty and made restitution. Our Supreme Court stated that the averments on the change of plea to guilty were not as specific as they might be and then stated:

". . . [B]ut they are sufficient to indicate that appellant was made to believe that he would receive a suspended sentence if he withdrew his plea of not guilty and entered a plea of guilty. This conduct even on the part of his own attorneys, would amount to a fraud upon appellant, which the trial court should neither allow nor countenance. It is not a sufficient base upon which to found a judgment taking away the right of liberty from a defendant charged with crime." *Long* v. *State, supra,* 231 Ind. at 62. Also see *United States* v. *Shneer* (E. D. Penn. 1951), 105 F. Supp. 883.

The majority's opinion fails to even mention *Long* v. *State, supra,* upon which *Dube* v. *State, supra,* relies. The record shows a clear abuse of discretion when read in the light of

*Long* v. *State* and *Dube* v. *State, supra.* The judgment of the trial court should be reversed for this reason alone.

REASON THREE: The artificial factual distinctions offered by the majority opinion do not take the present case outside the decisive influence of *Dube* v. *State* (1971), 257 Ind. 398, 275 N.E.2d 7.[6] *Dube, supra,* stands for the proposition that a trial judge has an affirmative duty to make an investigation of the circumstances surrounding the entry of the plea when information comes to his attention that a plea may have been induced by promises. There was more than an allusion to promises during the hearing. A full disclosure of the attorney's assurances to his client were made in the motion to correct errors. The *Dube, supra,* opinion, written by Justice Hunter, cautions that when a request is made to withdraw a plea of guilty, as was done here in Tyler's motion to correct errors, the trial court's concern should not be its own legal justification in accepting the guilty plea in the first instance.

---

6. The majority opinion states the following:

". . . This writer believes generally that the factual context in which rules of law are announced are often an absolutely essential ingredient to a proper understanding and application to those announced rules. The facts in *Dube* v. *State* indicate it would have been a flagrant miscarriage of justice to deny the defendant in that case to withdraw his plea. . .

"The contrast between *Dube* and Tyler is real and significant. Dube committed a crime not involving violence. Tyler committed a crime involving severe violence. One cannot question the violence when he observes the bloody and battered countenance of Mr. Boxell from a picture contained in the transcript. Tyler performed no public service in exchange for the recommendations of leniency but instead offered cash to his victim in exchange for the victim's recommendation. Dube cooperated fully with the authorities in shattering the forgery ring in which he was once a member in exchange for a recommendation by the prosecuting attorney for leniency. There is no evidence that Tyler would suffer bodily harm if he were incarcerated. Dube's life was threatened many times while he was incarcerated. The prosecuting attorney in *Dube* offered to recommend a suspended sentence for the one offense against Dube thus keeping Dube out of jail altogether. In this case the Prosecutor offered to recommend a sentence with regard to the charge of fleeing a police officer but he did not offer to make such a recommendation with regard to the charge of aggravated assault and battery, thus even under the agreement Tyler could have received jail time. . . ." This dissenting opinion takes the position that these factual distinctions are meaningless and invalid and do not take this case out of the decisive influence of *Dube* v. *State, supra.*

Tyler had been given assurances that he would not do any time on either charge by his attorney. His attorney's Affidavit attached to the motion to correct errors stated that the trial court ". . . would honor agreements made between defense and Prosecution. . . ." His defense counsel assured him that ". . . he should plead guilty to the charge as read that he would have nothing to fear and that the Court would accept the deals as arranged and would in fact give to the defendant suspension of all jail sentences as discussed between defense, Prosecution and the State's material witnesses." Tyler's factual circumstances are squarely within *Long* v. *State, supra,* and *Dube* v. *State, supra.* The degree of violence, the presence of a public service being offered or whether the defendant would have to go to jail or not are of no consequence and distinguish nothing as a matter of law. The distinctions offered by the majority are meaningless.

REASON FOUR: The guilty plea of Tyler was entered involuntarily. In *Brady* v. *United States* (1970), 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747, the Supreme Court of the United States stated in an opinion delivered by Justice White that:

> "The importance of assuring that the defendant does not plead guilty except with a full understanding of the charges against him and the possible consequences of his plea was at the heart of our recent decisions in *McCarthy* v. *U.S., supra,* and *Boykin* v. *Alabama,* 395 U.S. 238 (1969)." *Brady* v. *United States, supra,* 397 U.S. at 748-749 n. 6.

Tyler did not knowingly and intelligently understand the consequence of his plea. He was not given any indication that if the trial court did not accept the recommendation of the victim and the State that he would not be given an opportunity by the trial court to withdraw his plea of guilty and go to trial upon a plea of not guilty. No offer or suggestion of an offer was made by the trial court to Tyler or his attorney that the plea of guilty could be withdrawn since the trial judge did not intend to accept the recommendations of Mr. Boxell or the Prosecution. This is fatal to the voluntariness of the plea

entered by Tyler. Failure of the trial court to initiate an investigation after it appeared that promises had been made so tainted the proceedings with lack of due process that the trial court was committed as a matter of law to grant Tyler's motion to correct errors.

The trial court's judgment denying Tyler's motion to correct errors should be reversed with instructions to vacate the judgment and permit Tyler to withdraw his plea of guilty so that he can enter a plea of not guilty. The State's affidavit should then be tried upon the merits.

NOTE.—Reported at 296 N.E.2d 140.